1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MONA SPILLANE,

11            Plaintiff,                 No. 2:11-cv-1000-EFB (TEMP)

12        vs.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
              Defendant.              ORDER
15   _____/

16        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17   ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title

18   II of the Social Security Act ("Act").  For the reasons discussed below, the court denies

19   plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary

20   judgment, and directs the Clerk to enter judgment for defendant and close the case.

21   I.      Factual and Procedural Background

22        Plaintiff, Mona Spillane a/k/a Mona Rashid, born on March 9, 1975, filed an application

23   for DIB on February 6, 2006, alleging that she had been disabled since May 11, 2003.

24   Administrative Record ("AR") at 17, 55-56, 92.  Plaintiff's application was initially denied on

25   July 16, 2006 and upon reconsideration on November 17, 2006.  AR at 55-56.  On July 23, 2008,

26   a hearing was held before administrative law judge ("ALJ") David R. Mazzi.  AR at 26-54.

                                         1

1   Plaintiff, who was represented by attorney Phyllis Matyi, as well as a vocational expert ("VE"),

2   Stephen Davis, testified at the hearing.  *Id.*

3           On December 17, 2008, the ALJ issued a written decision finding that plaintiff was not

4   disabled for purposes of the Act.[1]  AR at 17-25.  The ALJ made the following specific findings

5   (citations to the Code of Federal Regulations omitted):

6           1.  The claimant filed an application on February 6, 2006 for disability benefits
               under Title II of the Act.

7
8           2.  The claimant met the insured status requirements of the Social Security Act as of
               and remained insured for disability benefit purposes through June 30, 2006.

9           3.  There is no evidence that the claimant engaged in any substantial gainful activity
               since May 11, 2003.

10  _____

11          [1] Disability Insurance Benefits are paid to disabled persons who have contributed to the
    Social Security program, 42 U.S.C. §§ 401 *et seq*.  Supplemental Security Income ("SSI") is paid
12  to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq*.  Under both provisions,
    disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to
13  "a medically determinable physical or mental impairment."  42 U.S.C. §§ 423(d)(1)(a) &
    1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits.  *See* 20 C.F.R.
14  §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The
    following summarizes the sequential evaluation:
15
                    Step one:  Is the claimant engaging in substantial gainful
16          activity?  If so, the claimant is found not disabled.  If not, proceed
            to step two.
17                  Step two:  Does the claimant have a "severe" impairment?
            If so, proceed to step three.  If not, then a finding of not disabled is
18          appropriate.
                    Step three:  Does the claimant's impairment or combination
19          of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
            404, Subpt. P, App.1?  If so, the claimant is automatically
20          determined disabled.  If not, proceed to step four.
                    Step four:  Is the claimant capable of performing his past
21          work?  If so, the claimant is not disabled.  If not, proceed to step
            five.
22                  Step five:  Does the claimant have the residual functional
            capacity to perform any other work?  If so, the claimant is not
23          disabled.  If not, the claimant is disabled.

24  *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25          The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26  evaluation process proceeds to step five.  *Id.*

4.  The medical evidence establishes that the claimant has the following severe impairments: myofascial pain syndrome, depression, and anxiety.

5.  The medically established disorders are not attended by clinical and laboratory findings that meet or equal the criteria of any section of the Listing of Impairments at 20 C.F.R., Part 404, Subpart P, Appendix 1 for twelve months.

6.  The claimant retains the residual functional capacity to perform at least sedentary work, as defined at 20 C.F.R. 404.1567(a), with the need for a sit or stand option every ten minutes.  Even assuming that the affective disorder is severe, she retains the ability to perform at least simple, repetitive tasks equating with unskilled work.

7.  The claimant is capable of performing her past relevant work.

8.  The claimant's vocational profile and residual functional capacity coincide with rules under The Medical-Vocational Guidelines of 20 C.F.R., Part 404, Appendix 2 that, when used as a framework for decisionmaking, establish that she remains able to perform jobs existing in significant numbers in the economy and direct a finding of "not disabled."

9.  The claimant is not disabled as defined in the Social Security Act at any time through the date of this decision.

AR at 19-24.

Plaintiff requested that the Appeals Council review the ALJ's decision.  AR at 12-13. However, on February 15, 2011, the Appeals Council denied review, leaving the ALJ's decision as the "final decision of the Commissioner of Social Security."  AR at 1-5.

II.    Standard of Review

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a

1  conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.*

2  *N.L.R.B.*, 305 U.S. 197, 229 (1938)).

3       "The ALJ is responsible for determining credibility, resolving conflicts in medical

4  testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

5  2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

6  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

7  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

8  III.    <u>Analysis</u>

9       Before addressing the specific issues raised by plaintiff,[2] a broad summary of plaintiff's

10  medical history is appropriate.[3]  Plaintiff's date last insured ("DLI") for purposes of DIB is June

11  30, 2006.

12                  *<u>Medical Evidence Pre-Dating Plaintiff's DLI</u>*

13       On July 22, 2003, at a pain management consultation with Dr. James Lee, Dr. Lee stated

14  that plaintiff had a 2.5 year history of low back/neck pain with radiation to the left arm and leg at

15  a 10/10 intensity.  AR at 175.  He noted that plaintiff did not find relief with trigger point

16  injections, chiropractic care, TENS,[4] or medication.  AR at 175.  Dr. Lee observed that plaintiff

17  had been worked up extensively, but that she had essentially normal lumbar and cervical MRIs.

18  AR at 175.  Neurology felt that her symptoms were consistent with cervical and lumbar radiculitis

19

---

20      [2] Although the court carefully scrutinized and considered each of plaintiff's arguments,
21  review of the issues raised by plaintiff is impeded by their being scattered in a hodgepodge
    fashion throughout plaintiff's brief rather than being logically presented and discussed on an
22  issue-by-issue basis.

23      [3] Because the parties are familiar with the factual background of this case, including
    plaintiff's medical history, the court does not exhaustively relate every fact and every medical
24  treatment note here, but instead summarizes the evidence most pertinent to the court's analysis.

25      [4] "Transcutaneous electrical nerve stimulation (TENS), used to treat some types of
    chronic pain, sends pulses of battery-generated electrical current to key points on a nerve
    pathway via electrodes taped to your skin."
26  *See* http://www.mayoclinic.com/health/medical/IM01523.

1    and cervical myofascial pain.[5]  AR at 175.  On physical examination, plaintiff had normal gait

2    and full range of motion, but experienced pain.  AR at 175-76.  Dr. Lee diagnosed plaintiff with

3    cervical and lumbar radiculopathy, noted that plaintiff was unwilling to repeat injections, and

4    recommended a trial of Neurontin and acupuncture.  AR at 176.  On September 11, 2003,

5    plaintiff complained of similar pain during a visit to the 45th Street Clinic, and the doctor noted

6    that plaintiff was a graduate student and that the onset of pain seems to have been due to stress.

7    AR at 299.

8          Subsequently, on October 27, 2003, Dr. Michael Eschleman described plaintiff as a

9    "healthy appearing woman" who ambulates without a limp or pain.  AR at 365.  At the time,

10   plaintiff reported chronic neck and back pain with fatigue, but stated that she was essentially able

11   to do all of her normal activities in spite of symptoms, including yoga and working out on a

12   treadmill.  AR at 365.  Dr. Eschleman diagnosed her with brachial plexus lesions, low back pain,

13   and somatic dysfunction, and instructed plaintiff to perform home exercises.  AR at 366.  At a

14   November 17, 2003 visit, Dr. Eschleman noted significant symptomatic and objective

15   improvement and encouraged plaintiff to continue with the home exercises.  AR at 363-64.  On

16   December 10, 2003, he again noted significant symptomatic and objective improvement and

17   referred plaintiff for physical therapy and massage in addition to home exercises.  AR at 362-63.

18   When plaintiff requested prescription medication on February 2, 2004, Dr. Eschleman stated that

19   he would prescribe Vicodin for a defined time of about 2-3 weeks, but indicated that narcotic

20   medications were not recommended for chronic problems and that he anticipated plaintiff's

21   therapy to manage plaintiff's symptoms.  AR at 360.  Plaintiff again saw Dr. Eschleman on March

22   8, 2004.  AR at 358-59.  At that time, he again noted significant objective improvement, but that

23

24          [5] Myofascial pain syndrome is a chronic pain disorder in which pressure on sensitive
     points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body.
25   Treatment options include physical therapy, trigger point injections, pain medications, and
     relaxation techniques.
26   *See* http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042.

plaintiff indicated that her pain was interfering with her ability to study and go to class.  AR at

358.  Dr. Eschleman encouraged her to continue with home exercises and physical therapy which

plaintiff found helpful, and suggested a consultation with the pain clinic, indicating that muscle

relaxers and narcotic analgesics are not an acceptable solution.  AR at 358-59.

Thereafter, in April and May 2004, plaintiff consulted the 45th Street Clinic for chronic

myofascial pain, stress, and poor sleep.  AR at 301-06.  April 2, 2004 clinic notes indicated that

plaintiff was a full-time student and seemed more interested in services through the clinic, such as

yoga, massage, and physical therapy, than further evaluation.  AR at 304-05.  On May 27, 2004,

it was noted that plaintiff was unable to do physical therapy at that time, because she was going to

India for 2-3 months.  AR at 301.  After language study in India, plaintiff returned to the 45th

Street Clinic on September 3, 2004, and her myofascial pain syndrome was assessed as improved.

AR at 300.

Plaintiff returned to Dr. Eschleman on October 28, 2004, reporting increased pain

symptoms, exhaustion from the pain, and difficulty concentrating, and questioning whether she

should drop out of school that quarter.  AR at 356-57.  He assessed her with chronic neck,

shoulder, low back, and hip pain, and noted that she was also depressed, which intensified her

focus on the pain.  AR at 357.  He recommended that she do her home exercises twice a day, and

referred her to physical therapy to augment her home exercises and to mental health for

evaluation of her depression.  AR at 357.  On February 22, 2005, Dr. Eschleman found that

plaintiff's symptoms have worsened over the past year, which he suspected was due to her no

longer receiving physical therapy that had benefitted her in the past.  AR at 355.  Noting that she

was only doing her home exercises once a day, he encouraged her to do them twice a day.  AR at

355.  Plaintiff stated that she would obtain information about obtaining a leave of absence from

her studies.  AR at 355.

Subsequently, on April 13, 2005, plaintiff was examined by psychiatric nurse practitioner

Jill Diane Shea with complaints of anxiety, depression, sleep problems, excessive tiredness,

impaired concentration, and decreased memory.  AR 351-53.  Plaintiff reported that although she

was in her Ph.D. program full time, she felt she was not doing well and was close to dropping out

due to chronic health problems and not being able to get her work done.  AR at 352.  She also

described relationship problems with her family and husband.  AR at 351-52.  She stated that she

was about 60% compliant with her treatment plan and admitted to using marijuana, but "never

problematically."  AR at 351-52.  Ms. Shea diagnosed plaintiff with anxiety and rather chronic

depression with perhaps somatic symptoms, but noted that she was cooperative and pleasant,

exhibited fair judgment, and that there was no evidence of thought disorder or cognitive

impairment.  AR at 352.  She assessed plaintiff with a GAF score of 53[6] and recommended a

medication regimen with Lexapro and therapy.  AR at 352-53.  The next day, Dr. Eschleman

observed that plaintiff's chronic pain and depression were interfering with her studies and

referred her to the pain clinic, voicing his support for a medical leave of absence during the

prescribed treatment.  AR at 349-50.  Later that month, plaintiff informed Ms. Shea that she was

calmer; her sleep, mood, and outlook were better; and that she was feeling more optimistic about

the Lexapro and experienced no major side effects.  AR at 348.

Thereafter, on May 12, 2005, plaintiff commenced treatment with pain management

physician Dr. Janet Ploss at the Pain Management Clinic.  AR at 267-70.  Plaintiff reported that

her neck and back pain had been about the same for 4 years, varying in severity from 4/10 to

10/10 and experiencing relief with stretching, breathing, acupuncture, massage, and chiropractic

care.  AR at 267.  The pain was made worse with sitting, looking down, reading, typing, writing,

and lying on her left side with her legs straight.  AR at 267.  She described anxiety, irritability,

and depression at levels of 10/10 and indicated that she smoked marijuana every night for the last

---

[6] GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM IV").  According to the DSM IV, a GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.*

two years.  AR at 268.  Dr. Ploss found plaintiff to be bright and a good historian.  AR at 268.
Upon examination, plaintiff had full strength in all extremities, and Dr. Ploss noted that a very
small disk bulge at C7-T1 shown on an MRI could not explain plaintiff's diffuse myofascial pain.
AR at 269.  Dr. Ploss diagnosed chronic myofascial pain syndrome without evidence of cervical
or lumbar radiculopathy; non-restorative sleep; and suspect depression.  AR at 269.  She
prescribed physical therapy, a gradually increasing quota-based walking program (with an
admonition to avoid overdoing), relaxation exercises, and continued psychotherapy.  AR at 269-
70.  Dr. Ploss supported a leave of absence over the summer, with plaintiff to participate in a 3-
week structured pain program in August 2005 and return to school in September 2005.  AR at
269-70.  Plaintiff was cautioned to discontinue marijuana, which Dr. Ploss opined was
contributing to her depression.  AR at 269.

       That same day, psychologist Kimberly Blake performed a psychological evaluation of
plaintiff.  AR at 262-65.  Plaintiff appeared alert, oriented, appropriate, and cooperative, and
minimal pain behaviors were observed.  AR at 262.  She reported doing about 2 hours of physical
activity every day, doing scholastic activities or household chores most of the day, but admitted
that she had problems with overdoing it.  AR at 262.  Stress, anxiety, and irritability increased her
pain.  AR at 262.  Plaintiff described a strained and distant relationship with her family in part
due to marrying outside Pakistani culture, as well as marital issues.  AR at 263.  She initially
reported that she occasionally smoked marijuana, but when further pressed admitted smoking it
every day for the past two years and that it was probably a problem for her.  AR at 263.  She
stated that she was really depressed and that she was having difficulty keeping up with
schoolwork or "accomplishing anything."  AR at 264.  Dr. Blake diagnosed plaintiff with a major
depressive disorder and a GAF of 55.  AR at 264.  She explained that plaintiff's profile was also
consistent with an individual experiencing significant somatic complaints – often describing
significant pain problems, concerns about health, and complaints of poor physical functioning that
may increase with stress - with social reinforcement of her pain behaviors by her husband through

increased attention.  AR at 264-65.  She opined that plaintiff's depression also likely interacted
with her pain, and she recommended continued counseling and medications for rehabilitation.
AR at 264-65.  Dr. Blake further strongly recommended discontinuation of marijuana use, which
likely contributed significantly to her depression and thus her pain.  AR at 265.

At a June 17, 2005 evaluation with physical therapist Sharon Brauns, plaintiff indicated
that she had applied for a leave of absence from her Ph.D. program to attend the structured pain
program in August 2005.  AR at 257.  She stated that her pain was 10/10 much of the time, it
exhausted her so much that she had difficulty taking a shower, she could not walk further than 10
blocks most days, and she described difficulties with doing her nails and shaving, but reported
that she was not taking any pain medications.  AR at 257-59.  Ms. Brauns discussed pacing and
proper posture with plaintiff at length, and prescribed physical therapy and a home exercise
program including stretching and walking.  AR at 259.  At a subsequent July 22, 2005 visit, Ms.
Brauns stated that plaintiff was able to perform all her listed exercises and had some functional
improvement, but noted that she has not followed through with her walking program.  AR at 231-
32.

On July 27, 2005, Dr. Ploss reported that plaintiff recently drove from Seattle to the Bay
Area.  AR at 234.  Dr. Ploss confirmed her prior diagnoses of chronic myofascial pain syndrome,
non-restorative sleep, and suspect depression, and suggested that plaintiff take Vicodin by the
clock, pace herself, avoid overdoing, and continue with relaxation techniques and physical
therapy.  AR at 234-35.  She encouraged plaintiff to walk progressively more and indicated that
the plan was for plaintiff to return to school in the fall after participation in the structured pain
program.  AR at 235.  However, on August 4, 2005, plaintiff informed Dr. Ploss that her
insurance had not approved the August pain program.  AR at 216.  Plaintiff was frequently home
crying and Dr. Ploss observed that she had not been seeing her counselor or Ms. Shea, but merely
taking Lexapro.  AR at 216.  Dr. Ploss found that her depression was only partially treated and
she discussed with plaintiff the mutually reinforcing nature of chronic pain, poor sleep, anxiety,

1   and depression.  AR at 217.  Dr. Ploss prescribed a quota-based walking and sitting program and

2   home exercise program, cautioned her to avoid overdoing, and urged her to follow up with Ms.

3   Shea and her counselor.  AR at 217.

4          Subsequently, on September 26, 2005, plaintiff informed Dr. Ploss that she was doing

5   better, sleeping fine, doing a walking program of 30-45 minutes, doing regular exercises, and

6   pacing herself.  AR at 214.  She continued to experience some groin pain and diffuse muscle

7   tenderness and tightness.  AR at 214.  Dr. Ploss recommended walking daily instead of every

8   other day and returning to physical therapy.  AR at 214.  By October 21, 2005, plaintiff reported

9   further improvement (walking 1.5 hours and doing 70 crunches a day with adequate sleep),

10  although her tailbone bothered her and she experienced left neck tightness.  AR at 211.  Dr. Ploss

11  commented that plaintiff was making good progress in counseling, that it was having a very

12  beneficial effect on her pain and ability to cope, and that they would discuss tapering the Vicodin

13  at the next visit despite plaintiff's reluctance.  AR at 211.  She also opined that plaintiff's

14  prognosis for returning to graduate school was good.  AR at 211.

15         Thereafter, plaintiff was able to resume physical therapy, and although plaintiff reported

16  increased pain with the physical therapist's program to Dr. Ploss on November 17, 2005, Dr.

17  Ploss opined that plaintiff likely overdid it in determining her baseline.  AR at 206.  She advised

18  plaintiff to continue with her medications and to re-define her exercise program with her physical

19  therapist.  AR at 206.  Physical therapy notes from December 13, 2005 indicate that plaintiff had

20  good tolerance for the treatment, was doing her home program, was consistently walking 45-50

21  minutes daily (as opposed to erratically walking for over 2 hours occasionally), was able to sit for

22  45 minutes at a time, and was better aware of pacing.  AR at 201-02.  Plaintiff reported being

23  "quite comfortable through most of the day now" and having taken a two-week trip to California,

24  where she was able to cook, walk, and continue her program without being overly anxious.  AR

25  at 202.  Ms. Brauns discussed a sitting quota program to allow plaintiff to achieve the amount of

26  sitting required to return to her Ph.D. program in another quarter.  AR at 201-02.

On December 21, 2005, plaintiff told Dr. Ploss that she was doing much better, following a daily exercise program, and pacing herself better.  AR at 197.  She described an enjoyable visit with family and stated that she was ready to stop using Vicodin.  AR at 197.  Upon examination, Dr. Ploss found only some tenderness of the spine and muscles.  AR at 197.  She commended plaintiff on how well she was doing with rehabilitation and stressed the importance of pacing, regular exercises, continuing her walking program and physical therapy, and relaxation techniques.  AR at 197.  Dr. Ploss opined that plaintiff was independent in a self-management program with significantly diminished symptoms, noting that she was looking forward to returning to school, and released plaintiff from her care at the Pain Management Clinic.  AR at 198.

Subsequently, on July 12, 2006, Dr. Eschleman evaluated plaintiff for purposes of Washington state disability benefits.  AR at 281-84.  He indicated diagnoses of neck and back pain with associated somatic dysfunction.  AR at 283.  Dr. Eschleman rated these conditions as "moderate."[7]  AR at 283.  He opined that she was limited to sedentary work, which was defined as "the ability to lift 10 pounds maximum and frequently lift and/or carry such articles as files and small tools" and "may require sitting, walking and standing for brief periods."  AR at 283.  He stated that she could do all postural activities, such as balancing, bending, climbing, crouching, handling, kneeling, pulling, pushing, reaching, sitting, and stooping, but that these activities were limited in duration by pain.  AR at 283.  Dr. Eschleman further noted that plaintiff was able to participate in job searches and employment classes, that physical therapy and psychotherapy were recommended to improve employability, and that her functional capacity should be reevaluated in 3 months.  AR at 284.  During that visit, plaintiff reported to Dr. Eschleman that she continued to

[7] The form allowed for ratings of "none" - no interference with the ability to perform basic work-related activities; "mild" - no significant interference with the ability to perform basic work-related activities; "moderate" - significant interference with the ability to perform one or more basic work-related activities; "marked" - very significant interference with the ability to perform one or more basic work-related activities; and "severe" - inability to perform one or more basic work-related activities.  AR at 283.

take Lexapro and Trazadone for depression, but that her depression symptoms were controlled on this regimen, she was sleeping normally, she had discontinued psychotherapy, and that she was only doing her tension releasing exercises sporadically.  AR at 286.

On July 14, 2006, the Disability Determination Service (or "State Agency") psychiatrist Dr. Steven Haney determined that there was insufficient evidence in the record to assess plaintiff's mental impairments.  AR at 308-21.  He observed that plaintiff had been notified via two letters of a psychiatric consultative examination scheduled for June 1, 2006, although plaintiff could not be reached by phone.  AR at 320.  Plaintiff failed to appear, and neither plaintiff nor her spouse had responded to subsequent correspondence requesting a call-in.  AR at 320.  On November 16, 2006, State Agency psychologist Dr. Stephen Goldberg affirmed Dr. Haney's assessment.  AR at 329.

### *Medical Evidence Post-Dating Plaintiff's DLI*

In the latter half of 2006 and 2007, plaintiff received care at High Point Medical Center. AR at 402-62.  On October 5, 2006, Dr. Eschleman stated that plaintiff reported doing well and walking between 90-115 minutes a day, but that she still complained of pain when she sat or typed for very long.  AR at 371.  Dr. Eschleman assessed depression with a somatization disorder, and opined that she was doing well.  AR at 371.

On April 16, 2007, Dr. Terrence Truxillo at the Pain Management Clinic examined plaintiff, noting that she had last visited Dr. Ploss at the clinic in December 2005.  AR at 393. Plaintiff described significant improvement in her pain symptoms, but not complete resolution, and that her pain still sometimes causes her to "forget everything and cloud her vision."  AR at 393.  Upon examination, Dr. Truxillo found good range of motion, normal extension and flexion, normal strength and reflexes throughout, and observed that plaintiff sat without severe pain, although he found some tenderness of her spine and paravertebral muscles.  AR at 394.  Dr. Truxillo diagnosed low back pain and an anxiety disorder, stating that her pain was doing much better with her physical therapy exercises, that she continued to have an adequate amount of fair

quality sleep, but that she still had some trouble with pacing.  AR at 394.  He counseled her to return to schooling when she felt she could tolerate it.  AR at 395.  Dr. Truxillo also observed that she "asked many, many detailed questions and appear[ed] to avidly observe her bodily sensations," suggesting a somatization disorder and "caution in aggressively pursuing her complaints."  AR at 395.

On April 24, 2007, psychologist Phyllis Sanchez completed a psychological evaluation of plaintiff for purposes of Washington state disability benefits, diagnosing depression and a somatization disorder both related to pain.  AR at 396-401.  Dr. Sanchez rated plaintiff's depressed mood, social withdrawal, and thought disorder as severe, and her motor agitation, motor retardation, and physical complaints as marked.  AR 397.  Dr. Sanchez found no functional limitations in plaintiff's ability to understand, remember, and follow simple or complex instructions or learn new tasks; found moderate social functional limitations; but assessed her ability to exercise judgment, make decisions, and perform routine tasks as markedly impaired. AR at 398.  She stated that plaintiff reported that her pain and depression have totally disrupted all relationships, work, and studies.  AR at 398.  Dr. Sanchez described plaintiff as "acutely mentally ill" as opposed to "chronically mentally ill" and opined that her degree of impairment would last a maximum of 1 year and a minimum of 6 months or less with treatment.  AR at 399.

Subsequently, plaintiff moved to California and a December 27, 2007 initial clinical assessment by trainee therapist David France at the Family Service Agency of Marin show that plaintiff was separated from her husband, living with friends, and felt as if she was experiencing an identity crisis, having been ostracized by her family and community due to her inter-racial marriage.  AR at 519.

On March 18, 2008, plaintiff was examined by Dr. Melanie Henry at the UCSF Pain Management Center.  AR at 547-50.  Although plaintiff stated that she had been essentially bedridden for 5-7 years, Dr. Henry found that plaintiff had 5/5 strength in her upper and lower extremities, normal muscle tone and bulk without obvious atrophy, a normal gait, but tenderness

1   in her back and neck.  AR at 547-48.  Dr. Henry diagnosed myofascial pain and noted that

2   plaintiff became very angry when she explained that plaintiff would not be prescribed narcotics

3   because they were not appropriate for treatment of myofascial pain.  AR at 549.  Subsequent July

4   14, 2008 MRI studies of the cervical and lumbar spine showed only mild abnormalities.  AR at

5   552-53.

6          Finally, an April 28, 2008 psychosocial assessment by Mr. France diagnosed an

7   adjustment disorder with mixed anxiety and depressed mood, a mood disorder, chronic back pain,

8   and a GAF score of 55.  AR at 540-46.

9          With this longitudinal view of the medical evidence in mind, the court now turns to the

10  issues raised by plaintiff at various steps of the sequential evaluation process.

11             <u>Step Two</u>

12         Plaintiff contends that the ALJ failed to follow the special technique for evaluating mental

13  impairments at step two as required by 20 C.F.R. § 404.1520a.

14         At step two, the technique requires that the ALJ first evaluate pertinent symptoms, signs,

15  and laboratory findings to determine whether the claimant has a medically determinable mental

16  impairment(s) and then rate the claimant's degree of functional limitation resulting from his or

17  her impairment(s) in four broad functional areas: activities of daily living; social functioning;

18  concentration, persistence, or pace (on a scale of none, mild, moderate, marked, or extreme); and

19  episodes of decompensation (on a scale of none, one or two, three, or four or more).  20 C.F.R.

20  § 404.1520a(b)-(c).  The ALJ must then determine the severity of the mental impairment(s) – a

21  rating of "none" or "mild" in the first three functional areas and "none" in the fourth area

22  generally results in a finding of not severe.  20 C.F.R. § 404.1520a(d).  In terms of documenting

23  application of the technique, the ALJ's written decision must "incorporate the pertinent findings

24  and conclusions based on the technique.  The decision must show the significant history,

25  including examination and laboratory findings, and the functional limitations that were

26  considered in reaching a conclusion about the severity of the mental impairment(s).  The decision

1    must include a specific finding as to the degree of limitation in each of the functional areas . . . ."

2    20 C.F.R. § 404.1520a(e)(4).

3         "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims."

4    *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  At this step, the ALJ may decline to find a

5    severe impairment or combination of impairments "*only if* the evidence establishes a slight

6    abnormality that has no more than a minimal effect on an individual's ability to work."  *Webb v.*

7    *Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).  If the claimant's mental

8    impairment(s) is found to be severe, the ALJ then proceeds to step three.  20 C.F.R.

9    § 404.1520a(d).

10        Here, after an extensive summary of the medical evidence of record, the ALJ found

11   moderate restrictions of daily activities; mild to moderate difficulties in social functioning; and

12   moderate impairment of concentration, persistence, and pace resulting from plaintiff's mental

13   impairments.  AR at 23.  Although plaintiff correctly notes that the ALJ made no explicit finding

14   regarding episodes of decompensation, plaintiff fails to point to any documented episodes of

15   decompensation found by her treating providers prior to her date last insured.  More importantly,

16   the ALJ resolved step two on the analysis in favor of plaintiff.  The ALJ actually found plaintiff's

17   mental impairments (depression and anxiety) severe at step two for purposes of the decision.  AR

18   at 19-20.  Given the favorable finding of severity, plaintiff cannot complain of any prejudicial

19   error at step two.

20        Plaintiff nevertheless also argues that the ALJ failed to consider her somatization disorder

21   at step two and beyond.  Although it is true that there are diagnoses of a somatization disorder in

22   the record, plaintiff fails to identify what functional limitations associated with the somatization

23   disorder had not been considered by the ALJ.  *See Burch v. Barnhart*, 400 F.3d 676, 684 (9th Cir.

24   2005) (explaining that the claimant "has not set forth, and there is no evidence in the record, of

25   any functional limitations as a result of her obesity that the ALJ failed to consider").  The medical

26   evidence clearly shows that the symptoms of her somatization disorder manifested as chronic

1  pain, anxiety, and depression, and plaintiff concedes as much in her own briefing.  *See* Pl.'s Mot.

2  for Summ. J., Dckt. No. 21 at 6:4-5 ("Her somatoform disorder manifests with severe myofascial

3  pain syndrome, depression, and anxiety.").

4      Stated differently, whether characterized as a somatization disorder, depressive disorder,

5  or anxiety disorder (and the exact diagnoses here differ among plaintiff's treating and examining

6  sources), the ALJ found plaintiff's manifesting symptoms of depression and anxiety to be severe

7  at step two and properly considered their associated limitations at all steps of the sequential

8  evaluation process, as discussed further below.

9                          Step Three

10      Plaintiff next asserts that the ALJ at step three failed to properly consider whether

11  plaintiff's mental impairments equaled a listing, in particular Listing 12.07 for somatoform

12  disorders.  Plaintiff correctly points out that the ALJ merely stated, without specific analysis, that

13  "[t]he medically established disorders are not attended by clinical or laboratory findings that meet

14  or equal the criteria of any section of the [Listings] for twelve months."  AR at 20.  Nevertheless,

15  any error in failing to provide more detailed findings and analysis was harmless for several

16  reasons.  *See Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir.1990) (harmless error analysis

17  applicable in judicial review of social security cases).

18      First, apart from referring to the ALJ's failure to provide detailed analysis, plaintiff herself

19  offers no actual theory of how she meets or equals a listing, nor does she cite any particular

20  record evidence in support of a claim that she does.  *See Lewis v. Apfel*, 236 F.3d 503, 514 (9th

21  Cir. 2001) (explaining that the claimant must at least offer a theory with some supporting

22  evidence that his impairments equal a listed impairment).

23      Second, the existing record evidence prior to plaintiff's last date insured does not support

24  an assessment that plaintiff's mental impairments meet or equal Listing 12.07, which requires that

25  the criteria of both parts A and B are satisfied.  The B criteria requires at least two of the

26  following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in

maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.07.  However, none of plaintiff's treating or examining providers during the insured period opined that plaintiff had marked restriction of daily living activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation of extended duration; nor did they offer any opinion with respect to a listing.  To the contrary, as noted above and discussed in greater detail below, plaintiff was assigned GAF scores falling within the range of moderate symptoms and moderate difficulty in social, occupational, or school functioning.  AR at 264, 353, 540.  Although plaintiff's own symptom testimony could be interpreted to established marked difficulties, "[a] finding of equivalence must be based on medical evidence only." *Lewis*, 236 F.3d at 514 (citing 20 C.F.R. § 404.1529(d)(3)).

Third, to the extent plaintiff contends that further expert evaluation with respect to potential medical equivalency was necessary, the court observes that plaintiff herself presented a significant obstacle to further development of the record.  Plaintiff failed to appear for a scheduled psychiatric consultative evaluation.  AR at 320.  Even if she somehow did not receive the two notices sent to her regarding the consultative examination, she also did not respond to subsequent correspondence requesting her to call in and reschedule.  AR at 320.  In light of this, plaintiff can hardly now be heard to complain about any alleged insufficient development of the record.  When a claimant fails to provide a good reason for missing a consultative examination arranged by the Commissioner, disability benefits may properly be denied.  *Atyemizian v. Astrue*, 2010 WL 1848159, at *2 (C.D. Cal. May 3, 2010) (citing 20 C.F.R. §§ 404.1518(a), 416.918(a)).

Finally, although plaintiff argues that the ALJ erred by failing to address at step 3 and beyond Dr. Sanchez's April 24, 2007 psychological evaluation suggestive of some marked limitations, this argument is without merit.  To be entitled to DIB under Title II, a claimant must prove that she became disabled before the expiration of insured status.  *Johnson v. Shalala*, 60

17

F.3d 1428, 1432 (9th Cir. 1995). Dr. Sanchez's opinion by far post-dates plaintiff's date last insured of June 30, 2006. AR at 396-401. Although her evaluation very briefly and in conclusory fashion noted plaintiff's medical history, there is no evidence that she examined plaintiff prior to April 24, 2007 or had some other sufficient basis for rendering an opinion as to plaintiff's mental functional limitations during the insured period. AR at 396. *See Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("the ALJ is not required to discuss evidence that is neither significant nor probative"). Moreover, Dr. Sanchez described plaintiff's mental condition as acute, rather than chronic, and indicated that her degree of impairment would last a maximum of 1 year and a minimum of 6 months or less with treatment. AR at 399.

For these reasons, the court concludes that any error at step 3 was inconsequential to the ultimate non-disability determination and therefore harmless.

<u>Assessment of Residual Functional Capacity ("RFC")</u>

Plaintiff further generally contends that the ALJ improperly evaluated the medical evidence in formulating plaintiff's RFC.

As an initial matter, the court notes that plaintiff does not appear to take issue with the physical component of the assessed RFC, i.e. that plaintiff retains the ability to perform at least sedentary work with the need for a sit or stand option every ten minutes. AR at 20. Indeed, as the ALJ noted, such an assessment is consistent with the record as a whole:

> The limitation to sedentary work is based primarily upon the claimant's ongoing pursuit of medical care that suggests she remains symptomatic despite the lack of supportive findings. I note that a restriction to sedentary work was indicated at Exhibit 4F, page 4. The claimant responded well to medical care under Dr. Ploss, which is consistent with some improvement and an ability to perform at least sedentary work functions. The subsequent examination reports of Dr. Eschleman, Dr. Truxillo, and Dr. Henry include minimally abnormal medical findings and medical improvement that is consistent with a capacity for sedentary work. Dr. Truxillo and Dr. Ploss recommended that the claimant pace her activities to avoid fatigue and increased symptoms. These recommendations show that the claimant's symptoms may exacerbate with overexertion and would support a limitation to sedentary work that demands minimal physical exertion of the type to aggravate the pain complaints. I have also given the claimant the benefit of the doubt, in

18

large part based on her subjective allegations and testimony, to find that a sit or stand option every ten minutes is indicated to relieve discomfort that arises because of prolonged positioning.

In July of 2006, Dr. Eschleman reported that the claimant had cervicalgia, somatic dysfunction of the cervical region and pelvic region, and low back pain. He believed that the disorders were of moderate severity causing interference with the ability to perform one or more basic work-related activities. In Dr. Eschleman's opinion, the claimant was able to crouch, bend, kneel, push/pull, reach, sit, stoop, balance, handle, and climb on a limited basis and was limited to sedentary work that contemplated lifting up to ten pounds and sitting, standing, and walking for brief periods. Dr. Eschleman further indicated that the claimant was able to participate in pre-employment activities such as job search and employment classes (Exhibit 4F/2). Dr. Eschleman's opinion closely approximates the finding herein of the claimant's residual functional capacity. I have given the claimant the benefit of the doubt to find her limited to sedentary work with a sit or stand option, based in part upon Dr. Eschleman's report and the claimant's testimony that she is intolerant of prolonged positioning.

AR at 21-22. Instead of challenging the exertional RFC findings, plaintiff argues that the ALJ improperly evaluated plaintiff's mental impairments in concluding that she retains the ability to perform at least simple, repetitive tasks equating with unskilled work. AR at 20.

Substantial evidence supports the ALJ's assessment of the mental component of plaintiff's RFC. With respect to the medical evidence during the insured period, in April 2005, psychiatric nurse practitioner Shea diagnosed anxiety and chronic depression with somatic symptoms, but found that plaintiff was cooperative and pleasant with fair judgment and no evidence of a thought disorder or cognitive impairment. AR at 352. She assessed a GAF score of 53, falling within the range of moderate symptoms and moderate difficulty in social, occupational, or school functioning, and prescribed Lexapro and therapy. AR at 352-53. The next month psychologist Dr. Blake also diagnosed a major depressive disorder and somatic symptoms, prescribing continued counseling and medication. AR at 264-65. However, Dr. Blake noted that plaintiff was alert, oriented, appropriate, and cooperative, with minimal pain behaviors observed, and assessed her with a GAF score of 55, again within the moderate range. AR at 262, 264. She also strongly urged plaintiff to stop smoking marijuana which likely contributed significantly to her depression, which was consistent with the opinion of Dr. Ploss. AR at 265, 269. Subsequently,

1   in August 2005 plaintiff reported frequent crying, but stated that she was not seeing her counselor

2   or Ms. Shea.  AR at 216.  Dr. Ploss found that her depression was only partially treated and urged

3   plaintiff to follow up with Ms. Shea and her counselor.  AR at 217.

4           At subsequent visits in September and October 2005, plaintiff reported doing better and

5   getting satisfactory sleep, and Dr. Ploss observed that plaintiff was making good progress in

6   counseling, which had a very beneficial effect on her pain and ability to cope.  AR at 211, 214.

7   Around December 2005, plaintiff took a two-week trip to California, which she described as

8   enjoyable and during which she was able to cook, walk, and continue her home exercise program

9   without significant anxiety.  AR at 197, 202.  Finally, on July 12, 2006, more than a week after

10  plaintiff's date last insured, Dr. Eschleman noted that plaintiff continued her medication for

11  depression, but that her symptoms were controlled on this regimen, she was sleeping normally,

12  she had discontinued her psychotherapy, and she was only doing her tension releasing exercises

13  sporadically.  AR at 286.  At that time, Dr. Eschleman opined that plaintiff was able to participate

14  in job search or employment classes.  AR at 284.

15          Therefore, although there is no question that plaintiff suffered from depression and

16  anxiety resulting from a depressive disorder, somatoform disorder, and/or anxiety disorder, the

17  medical evidence from plaintiff's treating and examining providers reflects that plaintiff

18  responded favorably to a regimen of therapy and prescribed medications as well as avoidance of

19  marijuana.  AR at 22-23.  Plaintiff's argument that the ALJ improperly relied on the opinion of

20  Social Security non-examining consultants to reject the opinions of plaintiff's treating providers

21  is devoid of merit.  Indeed, the non-examining consultants concluded that they had insufficient

22  evidence to rate plaintiff's mental impairments in large part because plaintiff failed to appear for

23  her consultative examination and made no efforts to reschedule it.  Thus, as is evident from the

24  decision, the ALJ relied *almost entirely* on the opinions of plaintiff's treating and examining

25  sources in evaluating her mental impairments and associated functional limitations.

26  ////

1    Plaintiff also contends that the ALJ improperly discounted her statements and testimony

2    regarding her symptoms and functional limitations.  "Credibility determinations are the province

3    of the ALJ" and are entitled to deference if the ALJ provides sufficient reasoning supported by

4    substantial evidence.  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  A two-step analysis is

5    used to determine whether a claimant's testimony regarding subjective pain or symptoms, and

6    resulting functional limitations, is credible.  First, the claimant "must produce objective medical

7    evidence of an underlying impairment which could reasonably be expected to produce the pain or

8    other symptoms alleged . . . ."  *Smolen*, 80 F.3d at 1281 (citations omitted).  "[T]he claimant need

9    not show that her impairment could reasonably be expected to cause the severity of the symptom

10   she has alleged; she need only show that it could reasonably have caused some degree of the

11   symptom."  *Id.* at 1282.  Second, once this initial showing is made and there is no affirmative

12   evidence of malingering, "the ALJ may reject the claimant's testimony regarding the severity of

13   her symptoms only if he makes specific findings stating clear and convincing reasons for doing

14   so."  *Id.* at 1283-84; *see also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

15       "General findings are insufficient; rather, the ALJ must identify what testimony is not

16   credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834; *see*

17   *also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).  In weighing a claimant's credibility,

18   the ALJ may consider, among other factors, her reputation for truthfulness; inconsistencies in her

19   statements and testimony, or between her statements or testimony and her conduct; her daily

20   activities; her work record; unexplained or inadequately explained failure to seek treatment or to

21   follow a prescribed course of treatment; and testimony from physicians and third parties

22   concerning the nature, onset, duration, frequency, severity, and effect of the symptoms of which

23   she complains.  *See Smolen*, 80 F.3d at 1284.  However, the ALJ may not find subjective

24   complaints incredible solely because objective medical evidence does not quantify them.  *Bunnell*

25   *v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).

26   ////

21

As an initial matter, the court notes that the ALJ did not entirely reject plaintiff's account of her symptoms and associated functional limitations.  He noted that plaintiff sought medical attention for her symptoms, had medical disorders to account for such symptoms, and had terminated her graduate studies due to her symptoms.  AR at 23.  The ALJ nevertheless concluded that the weight of the evidence, including plaintiff's educational background, did not establish that plaintiff was unable to perform simple, repetitive tasks on a sustained basis.  AR at 23.  To the extent that the ALJ discounted plaintiff's testimony regarding her symptoms and functional limitations, the ALJ provided several specific, clear, and convincing reasons for doing so.  After outlining the medical evidence, the ALJ reasoned as follows:

> The claimant complains of chronic and severe pain that has prevented her from goals such as successfully completing her graduate studies.  She stated that her pain, in the Spring of 2005, had caused an inability to sit through classes. Additionally, the claimant complained of difficulty communicating or comprehending.  She also described emotional symptoms that have also affected her ability to work.  With respect to her daily activities, the claimant testified that she is unable to cook but washes dishes and laundry.  According to the claimant, she receives assistance from relatives for laundry and shopping.  She drove to the hearing but testified that she avoids driving.  As noted above, I find that there are medical disorders to account for the type of subjective complaints.  The alleged intensity, persistence and functionally limiting effect of the subjective complaints, however, are found credible only to the extent that they are consistent with the residual functional capacity finding herein, based upon the record as a whole.  As noted, the claimant has sought medical attention for symptoms that supports her claim that she is symptomatic, but she has undergone pain management with good results.  Examinations have not shown any signs of muscle atrophy due to disuse from pain or other abnormalities consistent with the alleged severity.  While the claimant reported that she was essentially bedridden, the medical evidence shows that she has pursued activities, including significant walking and pursuit of an advanced degree, that belie that degree of severity.  She was able to travel and spend the Summer of 2004 in India, and, in August of 2006, she traveled from Washington to California, albeit for a family tragedy.  She also changed her residence from Washington State to the Northern California area.  Although none of these activities alone refute the subjective allegations, they are consistent with the weight of the evidence in showing a greater functional capacity than alleged. When considering the evidence as a whole, I find that the alleged intensity, persistence, and functionally limiting effects of the subjective complaints cannot be found fully credible to the extent that they are inconsistent with the restricted residual functional capacity found herein.

AR at 23-24.

////

As discussed above, the medical evidence during the insured period supports the ALJ's finding that plaintiff retains the ability to perform at least simple, repetitive tasks equating with unskilled work.  The ALJ appropriately synthesized and translated plaintiff's assessed limitations into this RFC.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173-74 (9th Cir. 2008); *see also* 20 C.F.R. § 404.1545 (defining RFC as "the most you can still do despite your limitations."). Although subjective complaints may not be found incredible solely because objective medical evidence does not quantify them, the ALJ properly considered the medical evidence and the statements of plaintiff's treating physicians and therapists as one relevant factor in evaluating the credibility of plaintiff's testimony.

The medical evidence also supported the ALJ's finding that plaintiff responded favorably to a regimen of therapy and prescribed medications.  *See Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling"); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (reasoning that a favorable response to conservative treatment undermines complaints of disabling symptoms). Indeed, the record as a whole shows that plaintiff's functional ability significantly improved when she was pacing herself and following the treatment prescribed by her treating providers, as opposed to times when she was smoking marijuana; not following her quota-based, paced exercise regimen; not receiving psychotherapy; or otherwise non-compliant with treatment.

Finally, the ALJ also permissibly found that plaintiff's activities and travel were inconsistent with her allegations of disabling symptoms and limitations.  Although plaintiff's pain and mental limitations may preclude her from rigorous academic doctoral studies, this does not necessarily mean that she is unable to perform simple, routine tasks on a sustained basis, which would involve significantly less concentration and stress.  To the extent that there was conflicting evidence concerning plaintiff's level of activity and functioning, it is the function of the ALJ to resolve any ambiguities, and the court finds the ALJ's assessment to be reasonable and supported by substantial evidence.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming

ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and the ALJ's interpretation "may not be the only reasonable one").  As the Ninth Circuit explained:

> It may well be that a different judge, evaluating the same evidence, would have found [the claimant's] allegations of disabling pain credible.  But, as we reiterate in nearly every case where we are called upon to review a denial of benefits, we are not triers of fact. Credibility determinations are the province of the ALJ . . . Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.

*Fair*, 885 F.2d at 604.

For the reasons outlined above, the court finds that the ALJ's assessment of plaintiff's RFC was supported by substantial evidence in the record as a whole.

### Step Five

Finally, plaintiff curiously argues that the ALJ improperly relied on the Commissioner's Medical-Vocational Guidelines (the "Grids") at step five, because her nonexertional limitations were sufficiently severe so as to require vocational expert testimony.  This argument is factually incorrect.  The ALJ did utilize vocational expert testimony along with the Grids as a framework for decisionmaking at step five, which was an appropriate means of evaluating the alleged exertional limitations.

The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at various functional levels.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(b).  "Approximately 200 separate unskilled sedentary occupations can be identified, each representing numerous jobs in the national economy."  *Id.* § 201.00(a).  The ALJ observed that if plaintiff, a younger individual with a master's degree, were capable of performing a full range of unskilled sedentary work, Rules 201.28 or 201.29 of the Grids would direct a finding of "not disabled."  AR at 24.  However, because plaintiff required a sit or stand option every ten minutes, the ALJ solicited vocational expert testimony based on this additional restriction, which

1    the vocational expert testified results in a 40% erosion of the unskilled sedentary job base.  AR at

2    24, 51.  The ALJ then reasonably concluded that plaintiff remained able to perform a majority of

3    the unskilled sedentary jobs administratively noticed in the Grids, which represented a significant

4    number of jobs in the national economy.  AR at 24.  Therefore, the ALJ did not err at step five.[8]

5    IV.    Conclusion

6          Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

7          1.  Plaintiff's motion for summary judgment (Dckt. No. 21) is DENIED;

8          2.  Defendant's cross-motion for summary judgment (Dckt. No. 30) is GRANTED; and

9          3.  The Clerk is directed to enter judgment for defendant and close this case.

10   DATED:  September 11, 2012.

11
12                                  EDMUND F. BRENNAN
                                    UNITED STATES MAGISTRATE JUDGE
13

14

15

16

17

18

19

20

21

22

23

24       [8] Furthermore, as defendant points out, any error at step five may well be irrelevant,
     because the ALJ also found at step four that plaintiff could perform her past relevant work as a
25   receptionist as it is generally performed in the economy.  AR at 24.  Although plaintiff argues
     that the underlying RFC assessment is erroneous (an argument that the court has already rejected
26   for the reasons outlined above), plaintiff does not point to any other errors at step four.